**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 16-Cr-10251-DJC (JCB)** |
| | ) | |
| **ANGEL MORALES, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO SEVER**

The United States of America, by and through the undersigned Assistant United States

Attorney, respectfully submits this memorandum in opposition to the severance motions filed by

defendant Angel MORALES ("MORALES") (ECF Dkt. 55) and by defendant Roberto FONSECA-

RIVERA ("FONSECA-RIVERA") (ECF Dkt. 64). In their respective motions, both MORALES

and FONSECA-RIVERA argue that a severance is necessary to avoid Confrontation Clause

concerns presented by *Bruton v. United States,* 391 U.S. 123, 135-36 (1968). Specifically,

MORALES contends that introduction of FONSECA-RIVERA's confession at a joint trial will

violate the Confrontation Clause to the extent that FONSECA-RIVERA implicates MORALES in

the cocaine trafficking conspiracy in which both defendants are charged. Similarly, FONSECA-

RIVERA complains that introduction of MORALES's confession at a joint trial will violate the

Confrontation Clause to the extent that MORALES's confession implicates FONSECA-RIVERA.

Although each defendant is correct that the other's confession *in its current form* may present

Confrontation Clause concerns, both defendants are incorrect that severance is the necessary or

appropriate remedy. Rather, consistent with the admonitions of the Supreme Court and First Circuit

that joint trials are to be conducted whenever possible, the Government submits that any potential

*Bruton* issues may be cured through the use of limiting instructions combined with: (i) redactions that remove specific references to the identification of FONSECA-RIVERA in the agent's testimony describing MORALES's confession; and (ii) redactions that remove references to MORALES in the agent's testimony describing FONSECA-RIVERA's confession. Accordingly, both defendants' motions to sever should be denied.

## I.      FACTUAL BACKGROUND

Because the prosecution in this matter was initiated by complaint, many of the background facts may be found in the Affidavit of U.S. Postal Inspector Stephen P. Dowd dated July 22, 2016 (ECF Dkt. 1) (hereinafter, "the July 22, 2016 Dowd Affidavit"). Attached to the July 22, 2016 Dowd Affidavit and incorporated by reference was a second affidavit of U.S. Postal Inspector Stephen P. Dowd dated July 18, 2016 (ECF Dkt. 1, Exhibit) (hereinafter, "the July 18, 2016 Dowd Affidavit").[1]

In the July 18, 2016 Dowd Affidavit, Postal Inspector Dowd described an ongoing investigation involving various individuals, including defendants MORALES and FONSECA-RIVERA, who were receiving suspicious parcels via Priority Mail Express from Puerto Rico that were believed to contain cocaine. *Id.* Postal Inspector Dowd explained that the parcels were suspicious for several reasons including, among others, (1) the packages had all been shipped from Puerto Rico, a known source location for cocaine, *id.,* ¶ 14; (2) the packages had been mailed via Priority Mail or Priority Mail Express with postage paid for in cash, *id.,* ¶ 28; (3) the packages were addressed from an individual to an individual, with some of the sender information being fictitious,

---

[1] Because the Affidavit described the activities of individuals who had not been charged (which at the time included FONSECA-RIVERA), the Affidavit appearing on the public docket was redacted. The unredacted version of the Affidavit should be in the Court's records, and the Government will file an unredacted copy under seal.

*id.*; and (4) the mailing labels were all handwritten, *id.  See generally id.*, ¶¶ 11-13 (explaining

commonly-shared characteristics of USPIS parcels that have been determined to contain controlled

substances).

With respect to defendants MORALES and FONSECA-RIVERA, Postal Inspector Dowd

detailed various facts that he believed established their involvement in cocaine-trafficking activities.

Postal Inspector Dowd explained that FONSECA-RIVERA had rented two private mailboxes from

Postal Center USA:  one in Canton, Massachusetts and the other in Randolph, Massachusetts.  *See*

July 18, 2016 Dowd Affidavit, ¶ 29.  Postal Service records reflected the delivery of at least seven

suspicious parcels from Puerto Rico to FONSECA-RIVERA's private mailbox in Canton, *id.*, ¶ 57,

at least one additional suspicious parcel to FONSECA-RIVERA's private mailbox in Canton, *id.*, ¶

65; and at least one additional suspicious to the private mailbox in Canton of another individual

related to the investigation, *id.,* ¶¶ 64-65.  The parcels all were suspicious in that they bore fictitious

information in the sender information, had handwritten labels, and postage was paid for in cash.  *Id.*,

¶¶ 57, 65.

On several occasions, surveillance officers observed FONSECA-RIVERA retrieve the

suspicious parcels (usually with MORALES in the car), *see, e.g., id.,* ¶¶ 58, 67, and the surveillance

officers later observed FONSECA-RIVERA discard the empty outer mailing boxes while en route

back to MORALES's apartment or business, *see, e.g., id.,* ¶¶ 59, 61, 67-68.  Law enforcement

officers retrieved these empty outer mailing boxes and discovered, in various instances, that the

mailing label and tracking numbers had been removed from the boxes.  *Id.,* ¶¶ 59, 68.  Postal

Inspector Dowd explained that, based upon his knowledge and experience, experienced drug

traffickers often removed the tracking number and mailing label in an attempt to make it impossible

for law enforcement to identify the sender or recipient of a discarded parcel.  *Id.,* ¶ 68.  A certified

3

and reliable drug-detecting canine subsequently reacted positively to drug odors in those empty boxes.  *See id.*, ¶¶ 59, 61 n.5, 68.

On two different occasions, surveillance officers also retrieved discarded trash near MORALES's apartment.  *See id.*, ¶¶ 60, 63.  This trash contained considerable evidence of drug trafficking (*e.g.*, plastic baggies with cut corners, plastic bags with white powder residue that field-tested positive for cocaine, wrapping materials for a kilogram of cocaine, a piece of paper with a tracking number that matched the tracking number of a parcel previously retrieved by FONSECA-RIVERA), as well as evidence linking the trash to MORALES (*e.g.*, a calendar for MORALES's business, a boarding pass to and from Puerto Rico in MORALES's name, a pharmacy prescription label in MORALES's name and bearing MORALES's home address).  *See id.*, ¶¶ 60, 63.

Surveillance officers also observed MORALES and FONSECA-RIVERA meet with an individual and engage in what appeared to be a hand-to-hand drug transaction.[2]  *See id.*, ¶ 62.

In the July 22, 2016 Dowd Affidavit, Postal Inspector Dowd reported that on July 19, 2016, officers conducted a search of MORALES's apartment pursuant to a search warrant.  *See generally* July 22, 2016 Dowd Affidavit, ¶ 13.  In the master bedroom, agents seized approximately $11,000 in U.S. currency, a .40 caliber Smith & Wesson handgun with an obliterated serial number, two magazines containing 15 rounds of ammunition each, and a box containing an additional 10 rounds of ammunition.  In the apartment's second bedroom, agents seized, *inter alia*, five plastic bags containing over 100 grams of cocaine, an additional quantity of what appeared to be marijuana, an

---

[2]  Although not pertinent to the Court's resolution of the pending motions, the Government anticipates that this individual (as well as another individual) will likely testify at trial and state that he bought cocaine from MORALES and from FONSECA-RIVERA.

electronic scale, a cooler containing thousands of tiny ziplock plastic bags with two metal spoons

containing white powder residue consistent with cocaine, and two cellular telephones.  *Id.*, ¶ 13.

After being administered his Miranda rights and waiving those rights, MORALES admitted

that the seized drugs (cocaine and marijuana) and the seized firearm and ammunition were his.  *Id*.

A.      **MORALES's Confession**

At MORALES's request, the interview on July 19, 2016, was neither audio- nor video-

recorded.  An interview report memorializing MORALES's statements is attached as Exhibit 1.

Although MORALES initially claimed to be just a middle man who obtained cocaine from

an "old man" in Brockton, MORALES ultimately admitted that he received shipments of cocaine

from Puerto Rico via the mail.  MORALES stated that each of the shipments contained either one-

half of a kilogram of cocaine or a full kilogram of cocaine.  MORALES admitted that he coordinated

the shipments with a source in Puerto Rico, and that he used a special phone dedicated for his drug

distribution.  MORALES indicated that he started receiving shipments in late 2015 and estimated

that he had received six shipments of cocaine.  MORALES stated that these shipments arrived at a

Postal Center in Canton or Randolph.

MORALES advised that he was informed by his Puerto Rican supplier when a package was

going to arrive and that his supplier would provide the tracking number for the package.

MORALES stated that once the package arrived in Canton or Randolph, he would go to the Postal

Center and retrieve the packages.  MORALES explained that he would go with someone else to

retrieve the packages.  MORALES stated that he would tell the shipper in Puerto Rico the name to

use on the packages.  MORALES identified the names he gave for the packages.

MORALES stated that once he was in possession of a package from Puerto Rico, he then

removed the contents of the package and dispose of the shipping box in a dumpster.  MORALES

stated the cocaine was usually wrapped in gift wrap paper.  MORALES stated he took the cocaine

back to his residence in Stoughton, but would not open the wrapping that concealed the cocaine.

MORALES stated that he then received a phone call from an unknown individual and coordinated a

meeting with this individual.  MORALES stated that he usually met an unknown individual in the

parking lot of a restaurant near his residence in Stoughton and gave the cocaine to this individual.  In

return, the individual gave cash to MORALES for payment for the drugs.

MORALES named the two individuals who went with him to retrieve the packages from the

Postal Centers in Canton and Randolph.  These two individuals were FONSECA-RIVERA and a

second individual, whom MORALES identified.[3]  MORALES stated that FONSECA-RIVERA was

his brother-in-law.  MORALES explained that some of the cocaine packages were addressed to

FONSECA-RIVERA.  MORALES explained that he would drive FONSECA-RIVERA to either

Canton or Randolph, and that FONSECA-RIVERA physically retrieved the boxes from the Postal

Center.  MORALES stated that he told FONSECA-RIVERA that the packages contained cocaine.

MORALES explained that he paid FONSECA-RIVERA $1,000 to retrieve the packages, and that

FONSECA-RIVERA was following MORALES's instructions.  MORALES advised that he

instructed FONSECA-RIVERA to open a postal box in FONSECA-RIVERA's name at the

Randolph location.[4]

---

[3]  Because this second individual has not been charged, the Government is redacting his name on the attachment filed on the public record.  A copy of the original, unredacted report will be filed under seal.

[4]  MORALES also stated acknowledged that he took a trip to Puerto Rico in June 2016 with FONSECA-RIVERA.  MORALES claimed that they did not meet with his drug supplier while in Puerto Rico.

MORALES also discussed his relationship with the second individual, whom he had identified.  MORALES explained that this second individual was a friend.  MORALES stated that on two different occasions, MONTALVO accompanied this friend to the Randolph location to retrieve packages of cocaine from Puerto Rico.  These packages were addressed to the friend.  According to MORALES, this friend, like FONSECA-RIVERA, also was aware that the packages contained cocaine because MORALES told him that they did.  Similarly, like he did with FONSECA-RIVERA, MORALES paid this friend $1,000 to retrieve the packages.  At MORALES's direction, the friend (like FONSECA-RIVERA) opened a postal box in the friend's name at the Randolph location.

### B.      FONSECA-RIVERA's Voluntary Statement

On July 26, 2016, FONSECA-RIVERA was interviewed by Postal Inspector Dowd and MA State Police Trooper Keith Pantazelos.  This voluntary interview took place at FONSECA-RIVERA's home, with FONSECA-RIVERA's son serving as an occasional interpreter when FONSECA-RIVERA had trouble understanding a question.  A copy of the report from this interview is attached as Exhibit 2.[5]

At the outset of the interview, agents advised FONSECA-RIVERA that he was not under arrest, that he did not have to answer questions, and that he could terminate the conversation at any time.  The agents asked FONSECA-RIVERA if they could talk to him about his association with MORALES.  FONSECA-RIVERA stated that he had known MORALES for about 22 years, starting

---

[5]  Consistent with the government's treatment of the report describing MORALES's confession, the Government is submitting a redacted copy of the report describing FONSECA-RIVERA's confession on the public docket and will file an unredacted copy of the report under seal.

when both men lived in Puerto Rico.  FONSECA-RIVERA advised that he was aware that

MORALES had been arrested.

Postal Inspector Dowd informed FONSECA-RIVERA of various facts uncovered during the

five-month long investigation dealing with kilogram quantities of cocaine shipped to him via the

mail to private mailbox addresses in Canton and Randolph, Massachusetts.  FONSECA-RIVERA

admitted that the packages addressed to him from Puerto Rico contained cocaine.  FONSECA-

RIVERA stated that MORALES paid him $500 for every package that he received at his two

different private mailboxes in Canton and Randolph.  FONSECA-RIVERA estimated that he picked

up seven or eight packages for MORALES from Puerto Rico.  FONSECA-RIVERA said that he was

often present when MORALES sold small amounts of cocaine to various customers.

FONSECA-RIVERA acknowledged that he also knew the second individual identified by

MORALES in his confession.  According to FONSECA-RIVERA, this individual also received

packages from Puerto Rico for MORALES.

## II.     ARGUMENT

The federal system prefers joint trials of defendants who are indicted together.  *See Zafiro v.*

*United States,* 506 U.S. 534, 537 (1993).  "The general rule is that defendants who are properly

joined in an indictment should be tried together."  *United States v. Floyd,* 740 F.3d 22, 36 (1st Cir.

2014).  In *Floyd,* the First Circuit emphasized that, "This rule has special force in conspiracy cases,

in which the severance of coconspirators' trials 'will rarely, if ever, be required.'"  *Id.,* (quoting

*United States v. Flores–Rivera*, 56 F.3d 319, 325 (1st Cir.1995) (internal quotation marks omitted)).

Joint trials for defendants who are indicted together "play a vital role in the criminal justice

system."  *Richardson v. Marsh,* 481 U.S. 200, 209 (1987).  Among other things, trying defendants

together promotes efficiency and "serve[s] the interest of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 210.

Although confessions by one defendant in a trial involving multiple defendants present issues that must be addressed so as to prevent Confrontation Clause issues, remedies short of severance are often more than sufficient. *See, e.g., Richardson,* 481 U.S. at 211; *see, e.g., United States v. Cartagena-Merced,* 986 F. Supp. 698, 705-06 & n.1 (D.P.R. 1997).

In *Bruton v. United States,* 391 U.S. 123 (1968), the Supreme Court discussed the constitutional concerns that arise in a joint trial in which one defendant's confession discusses the role of a second defendant and the second defendant does not have an opportunity to cross-examine the confessing defendant. These concerns remain in force even where, as here, both defendants have given interlocking confessions. *Cruz v. New York,* 481 U.S. 186, 193-94 (1987).

However, *Bruton* applies only to a statement that is "powerfully incriminating" against a codefendant—i.e., a statement that is "inculpatory on its face." *United States v. Celestin,* 612 F.3d 14, 19 (1st Cir. 2010) (quoting *United States v. Rodriguez-Duran,* 507 F.3d 749, 769 (1st Cir. 2007). Alternatives to severance exist to protect against any possible Confrontation Clause issues presented by introduction of one defendant's confession during a joint trial. "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when … the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson,* 481 U.S. at 211. Introduction of a confession that only implicates a co-defendant when linked with other trial evidence does not present a problem under *Bruton*. *Id.* at 208; *see, e.g., Celestin,* 612 F.3d at 19-20.

As the First Circuit has explained:

> Statements that facially incriminate a co-defendant are *per se* inadmissible under the rule of *Bruton v. United States*. By contrast,

> statements that incriminate a codefendant only when linked with
> evidence introduced later at trial can be admitted if references to the
> co-defendant are redacted and the jury is instructed not to consider the
> statement against any defendant other than the declarant.  We presume
> in the latter situation that the jury will follow instructions and consider
> the statement only for the proper purpose (assessing the declarant's
> guilt) and not the improper purpose (assessing the co-defendant's
> guilt).

*United States v. Figueroa–Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010) (internal quotations and citations omitted).

Applying the First Circuit's guidance here, the Government submits that—with respect to that portion of each defendant's confession that implicates only the defendant who confessed—a limiting instruction advising the jury to consider the confession only against the defendant who confessed is sufficient.  *See Richardson*, 481 U.S. at 206; *Celestin,* 612 F.3d at 20.

Thus, when agent testimony is introduced describing MORALES's confession as to his conduct alone (without reference to FONSECA-RIVERA), the jury must be advised that this testimony is being admitted only against MORALES and not against FONSECA-RIVERA, and that the jury is to consider this testimony only as it pertains to MORALES.  Similarly, when testimony is introduced describing FONSECA-RIVERA's confession as to FONSECA-RIVERA's conduct (without reference to MORALES), the jury must be advised that the testimony is being admitted only against FONSECA-RIVERA and not against MORALES, and that the jury is to consider this testimony only as it pertains to FONSECA-RIVERA.

With respect to those portions of the confessions that implicate the other defendant, the Government submits that well-placed redactions—combined with cautionary instructions—will be sufficient to address any Confrontation Clause concerns.  Turning first to MORALES's confession, the Government recognizes that MORALES, in addition to discussing his own role, also discussed the activities of others, including FONSECA-RIVERA.  For example, MORALES stated that he

went to Postal Centers in Canton and Randolph to retrieve the packages with other people (*i.e.,* FONSECA-RIVERA and a second individual). For the Government's purposes at trial, this is sufficient–the Government does not need to introduce the names of the individuals mentioned by MORALES. *See, e.g., Gray v. Maryland,* 523 U.S. 185, 197 (1998) (indicating that while a redacted answer to the question "Who was in the group that beat Stacy" in the form "Me, deleted, deleted, and a few other guys" was improper, a redacted answer "Me and a few other guys" would have been acceptable).

Similarly, in his confession, MORALES stated that: (1) the packages from Puerto Rico containing cocaine were addressed to both MORALES and a second individual; (2) both men knew that the packages contained cocaine because MORALES told them that they did; (3) at MORALES's direction, both men opened up postal boxes in their respective names; and (4) MORALES paid both men $1,000 in cash to retrieve the packages.

Once again, the Government believes that a redaction that replaces "other individuals" for the specific individual's names will solve the problem in a manner recommended by *Gray*. In other words, the testifying government agent can be instructed to state simply that "(1) MORALES stated that the packages from Puerto Rico containing cocaine were addressed to other individuals; (2) these other individuals knew that the packages contained cocaine because MORALES told them that they did; (3) MORALES directed other individuals to open up postal boxes in their respective names; and (4) MORALES paid individuals $1,000 in cash to retrieve packages on his behalf. *See United States v. Vega Molina*, 407 F.3d 511, 521 (1st Cir. 2008) (observing that in cases involving numerous events and actors the use of a neutral phrase like "another person" typically will not create a direct inference to a specific defendant and thus will not present a *Bruton* issue).

Although arguably a closer call, the Government submits that well-placed redactions of FONSECA-RIVERA's confession—again with proper cautionary instructions—will similarly suffice to protect against Confrontation Clause concerns that MORALES might have.  For example, the Government need not have the agents testify that, upon their arrival, they informed FONSECA-RIVERA that MORALES was arrested or that they wanted to talk to FONSECA-RIVERA about his association with MORALES.  Similarly, the agents' testimony relating to FONSECA-RIVERA's confession can be limited to the following:  (1) the admission by FONSECA-RIVERA that the packages addressed to him from Puerto Rico did in fact contain cocaine; and (2) FONSECA-RIVERA's admission that he received $500 for every package he retrieved at his two different private mailboxes in Canton and Randolph.

By phrasing their answers in this manner, the agents will not testify that FONSECA-RIVERA in any way discussed MORALES's involvement or MORALES's participation in FONSECA-RIVERA's retrieval of the packages.  Nor will they indicate that FONSECA-RIVERA identified MORALES.  In short, the agent's testimony of their interaction with FONSECA-RIVERA will omit any reference to MORALES's existence.  That, combined with the proper cautionary instruction, should be sufficient under *Gray* and *Richardson*.  *See, e.g., Celestin*, 612 F.3d at 20.

The fact that the Government will ultimately link FONSECA-RIVERA and MORALES through other testimony—e.g., the observations of surveillance officers—does not run afoul of *Bruton's* proscriptions.  *See Richardson, 481 U.S. at 208; Celestin*, 612 F.3d at 20 ("potential corroboration of the government's case resulting from the admission of a codefendant's confession is insufficient, without more, to rise the level of a *Bruton* violation").  "Statements that are incriminating only when linked to other evidence in the case do not trigger application of *Bruton*'s preclusionary rule." *Vega Molina*, 407 F.3d at 520.

### III.   CONCLUSION

For all of the foregoing reasons, the defendants' motions to sever should be denied.

Respectfully submitted,

WILLIAM D. WEINREB
ACTING UNITED STATES ATTORNEY

By:      /s/ James E. Arnold
JAMES E. ARNOLD, DCBN 426040
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3603
Email:  james.arnold@usdoj.gov

Date:  May 22, 2017.


CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


  /s/ James E. Arnold
JAMES E. ARNOLD
Assistant U.S. Attorney


Date:  May 22, 2017.